UNITED STATES, Appellee,

v.

Carl DOWELL, Jr., Private U.S. Army, Appellant.

No. 35,827.

CMR No. 436321/G.

U. S. Court of Military Appeals.

Nov. 17, 1980.

For Appellant: *Captain Robert L. Gallaway* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Benjamin A. Sims, Captain Willard E. Nyman, III* and *Captain James Recasner* (on brief); *Major Charles A. Byler, Captain Charles F. Schmit, Jr.*

For Appellee: *Captain Stephen D. Smith* (argued); *Colonel Thomas H. Davis, Colonel R. R. Boller* (on brief); *Major Ted B. Borek, Major Douglas P. Franklin, Captain Lee D. Schinasi* and *Captain Rexford T. Bragaw, III.*

*Opinion of the Court*

EVERETT, Chief Judge:

The appellant was tried by general court–martial, consisting of military judge alone,

on charges alleging three absences without leave and maiming.[1] Notwithstanding his pleas of not guilty, he was convicted of all three unauthorized absences [2] and of aggravated assault as a lesser included offense of the charged maiming.[3] Thereupon, he was sentenced to a bad–conduct discharge, confinement at hard labor for 18 months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. In due course, the convening authority approved these results, and the United States Army Court of Military Review affirmed.

Upon appellant's petition to this Court, we granted review (5 M.J. 266) to determine if the military judge erred by permitting appellant's company commander to testify about certain statements made to him while appellant was in pretrial confinement. Specifically, the appellant insists that admission of these statements into evidence violated Article 31(d), Uniform Code of Military Justice, 10 U.S.C. § 831(d), as he had not been fully and correctly advised of his rights under Article 31(b), 10 U.S.C. § 831(b), before making the statements. Also, appellant claims violation of *United States v. McOmber*, 1 M.J. 380 (C.M.A.1976), since his company commander knew that Dowell was represented by counsel but did not contact that counsel before interviewing appellant. We agree in both respects.

### I

Appellant was arraigned on an original charge of unauthorized absence from November 5, 1976, to November 16, 1976, and on additional charges alleging that he had been absent without authority from December 17, 1976, to December 29, 1976, and from January 17, 1977 to May 7, 1977, and that on May 6, 1977, he had maimed Albert H. Moore by disfiguring his face and neck with a bottle. The original charge had been sworn to by Captain Alan C. Black as accuser on November 18, 1976; and on the next day that captain had informed appellant of the charge against him. That charge sheet fails to record when a copy thereof was served on Dowell by the trial counsel. The additional charges had been sworn to by Captain Black on May 17, 1977; and on May 19, 1977, he had informed Dowell of the charges against him. A copy of the charges was served on the accused on June 10, 1977, by direction of the trial counsel. On June 10, 1977, all of the charges were referred for trial together by a general court–martial convened by orders dated May 10, 1977. Both charge sheets reflected that on May 8, 1977, appellant had been placed in pretrial confinement at Mannheim, Germany.

In an effort to prove the maiming charge, the Government offered the testimony of the victim and of Tom Kelly, an eyewitness to the incident in which Moore had been injured. Joseph P. Smith, an Army Criminal Investigator, testified that soon after the incident involving Moore, he had interviewed appellant in a waiting room at an Army hospital. With the aid of Department of the Army Form 3881, Smith advised appellant of his rights; and on that same form Dowell executed a "waiver" to the effect that, "Understanding my rights as stated above, I am now willing to discuss the offense(s) under investigation without a lawyer being present."

According to Smith, he had advised appellant that he wished to "interview him concerning the offenses of desertion and an aggravated assault." Appellant then indicated "that he did not wish to discuss the

---

**1.** These offense were charged as violations of Articles 86 and 124, Uniform Code of Military Justice, 10 U.S.C. §§ 886 and 934, respectively. A further additional charge of aggravated assault, in violation of Article 128, UCMJ, 10 U.S.C. § 928, which grew out of the same incident as the alleged maiming, was not referred to trial on the recommendation of the Article 32, 10 U.S.C. § 832, investigating officer. *See* Article 32, UCMJ, 10 U.S.C. § 832. In some of the testimony about reading to the appellant a charge of aggravated assault, the witness may have been referring to this charge rather than to the maiming charge.

**2.** The termination date of the last absence, however, was amended.

**3.** The conviction of the lesser included offense of aggravated assault was a violation of Article 128 vice Article 124.

offense of desertion but would be willing to discuss the offense of aggravated assault without the presence of a lawyer." Without defense objection, Investigator Smith then recited what Dowell had told him about the injury to Moore on the night of May 6, 1977. Defense counsel brought out on cross–examination that Dowell had been quite cooperative with the investigator.

Subsequently, the Government called as a witness Captain Black, who was the accuser and also the appellant's company commander. This witness testified that two or three days after appellant had been placed in pretrial confinement, he had visited Dowell at the confinement facility in Mannheim. The purposes of the visit were "primarily, to give him his check for the Army–his pay check, and secondly, to accomplish the required health and welfare visits that I must conduct monthly for personnel in pretrial confinement."[4] Captain Black denied that he had asked any questions about the offenses with which appellant was charged; but he maintained that, nonetheless, Dowell had told him about the incidents which gave rise to the charges. The captain's general question, "Well, how is it going," received a detailed reply which included an account of how Moore had been cut.

Captain Black conceded that at the time of his visit to the stockade, he knew that Captain Richard H. Gasperini "was already the accused's attorney."[5] Captain Black, however, did not tell Gasperini that he was going down to visit the accused at the confinement facility, nor subsequently did he inform defense counsel that he had been there. Furthermore, although the captain told Dowell that he did not have to say anything about the incident, he "did not officially advise him of his rights under Article 31." Even though Captain Black realized that appellant was discussing with him the very incident that gave rise to the maiming charge, he "made no effort to properly advise him of his rights under Article 31." During the approximately twenty–five minutes that Captain Black was there with him, Dowell spent about fifteen minutes talking about the possible offenses. Black made no mention of any right to legal counsel.

The largest question in Dowell's mind at the time of Captain Black's visit "had to do with an assault charge, and he could not understand where this charge came from or how it was initiated. He was not aware of this charge." Captain Black added:

> I believe this charge was made after he had initially spoken with his defense lawyer, and he was quite disturbed about this particular charge. And that was primarily–my comments there were that I knew nothing about them either; that I had simply been informed by legal personnel in our unit that there was going to be an additional charge based on two statements that had surfaced after the incident. That was the primary–that was about the only time that I said anything to Private Dowell. He was conversing with me reference these items.

After argument had been presented to the military judge concerning the admissibility of Dowell's statements to Captain Black, the appellant testified about the circumstances under which the statement was obtained. According to him, after a question by the captain as to how he was doing, they sat down in the interview room at the stockade; and Captain Black "told me why he was down there–was to bring me my charge–an additional charge which had been added to my charges that they had preferred to me." However, Captain Black had already read to Dowell the unauthorized absence charges and an assault charge even before he was placed in pretrial confinement.[6]

---

4. Captain Black testified that he was required by regulations to make a monthly health–and–welfare visit to anyone in his command in pretrial confinement.

5. This same lawyer represented Dowell at the trial pursuant to the orders of May 10, 1977, which appointed a general court–martial to which Gasperini was detailed as defense counsel.

6. Also appellant's initial contact with his attorney, Captain Gasperini, had occurred at or about that same time and before he was placed in confinement.

Appellant denied that Captain Black, had given him a pay check when he came to visit Dowell at the stockade. Indeed, he denied receiving a check from anyone during his fifty–five days of pretrial confinement.[7] According to appellant, Captain Black, after reading him the charges, had asked about what happened, but had not advised Dowell of his right to remain silent or to have a lawyer.

When the trial counsel declined an invitation by the military judge to present further evidence, the judge on his own motion recalled Captain Black. In response to a specific question from the judge, the witness corrected his earlier testimony in this way:

> I must correct that. Yes, that was— that was a third reason for me going down there. I did have to read him charges. I had to read him that additional charge that showed up after he initially went to pretrial.

The reading of the charges occurred "after some preliminary remarks to the effect, How are you doing?, and things of that nature." The reading of the additional charge for assault disturbed the appellant, whose first comment was " 'I don't understand,' where did this come from type thing." Captain Black's "answer to him was, that I didn't know, an additional witness had obviously surfaced, and that was the extent of my knowledge as far as this latter charge." Thereupon, Dowell ·said, "Wow, I can't believe this. [H]e started to discuss his involvement in the various charges after this." He began with the charge of unauthorized absence in November, at which point Captain Black made the comment that appellant did not have to discuss the matter.

Upon cross–examination by defense counsel, Captain Black was not sure that he had taken a check down to appellant at the confinement facility. He persisted, however, in denying that he had asked Dowell to discuss any of the charges. Captain

Black testified that at the time of his interview with appellant at the confinement facility he had not been aware that Dowell had already spoken to CID agents.

Upon this evidence the military judge stated that he was "satisfied that the statements made by the accused were not obtained from him by Captain Black." Therefore, he ruled that Captain Black might "testify as to what the accused said to him on that occasion in the stockade." Of course, the accused's statements, as described by the captain, were quite damaging to the defense.

## II

"No statement obtained from any person in violation of" Article 31(b) of the Uniform Code "may be received in evidence against him in a trial by court–martial." Article 31(d). Paragraph 140a, Manual for Courts–Martial, United States, 1969 (Revised edition), places upon the Government the burden of establishing that suitable warnings were given before a confession or admission was obtained.

At about 1:45 a. m. on the morning of May 7, 1977, appellant received a full warning of his rights from the Army's criminal investigators. At this time he was being interviewed in the waiting room at an Army hospital. The contested statements were made to Captain Black several days later. According to the captain's testimony, this was on May 10 or 11, two or three days after Dowell had been placed in pretrial confinement. Significantly, the charge sheet containing the additional charges recites that Captain Black informed the accused of the charges against him on May 19, 1977. Since that date appears to have been written on the charge sheet in Captain Black's handwriting and is accompanied by his signature, the logical inference is that the interview with appellant occurred some eleven days after Dowell had been placed in confinement.

---

7. Black did not indicate in his testimony whether he made any subsequent visits to the appellant during his 55 days of such confinement;

the appellant testified that he did not. *See* n. 4, *supra.*

■ It appears then that at least three days—and probably twelve days—passed between the CID warning to appellant and his interview with his company commander. We do not believe that the language of Article 31(b), 10 U.S.C. § 831(b) contemplates that a warning of rights given several days before will be adequate.[8] The omission of a new warning is all the more fatal when, as in the case at bar, an accused has been placed in confinement during the intervening period. Concern with "custodial interrogation" underlies the Supreme Court's ruling in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in which a warning requirement was imposed upon investigators. After a suspect has been placed in confinement, he should be reminded before further interrogation that his rights to remain silent and to consult with counsel still exist.

Captain Black had been a company commander for some months before his interview with appellant. Frequently, he "had advised persons of their rights on other occasions." However, he readily conceded that he gave no Article 31(b), 10 U.S.C. § 831(b) warning to appellant and did not advise him of his right to counsel.

Under the wording of Article 31(d), 10 U.S.C. § 831(d) of the Code and of paragraph 140a of the Manual for Courts—Martial, inadmissibility is dictated only as to statements that are "obtained" without warning. A spontaneous admission by a suspect may not be "obtained" within the meaning of the statute. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). However, in the case at hand a service member held in pretrial confinement was being told by his company commander that the commander had accused him of serious offenses. In permitting receipt in evidence of an "admission by silence," the 1969 Manual for Courts—Martial states, "If an imputation against a person comes to his attention under circumstances that would reasonably call for a denial by him of the accuracy of the imputation if the imputation was not true, a failure on his part to utter such a denial will support an inference that he thereby admitted the truth of the imputation." Para. 140a(4). The underlying fact of human nature on which this Manual inference is based—namely, that persons falsely accused of a crime deny the accusation rather than remain silent—also makes it quite foreseeable that one who has been notified of serious charges against him will feel a need to say something in response to those charges.[9] The foreseeability of such a reaction is all the greater when the accused is in confinement and the charges against him are being presented to him by his unit commander.

■ When one takes action which foreseeably will induce the making of a statement and a statement does result, we conclude that the statement has been "obtained" for purposes of Article 31, 10 U.S.C. § 831. We need not question the good faith of Captain Black, who had a specific duty to inform the accused of the charges against him. *See* para. 32f(1), Manual, *supra*. However, since the acts involved in performing that duty had the natural tendency to induce the making of a statement by appellant, the warning requirement of Article 31(b), 10 U.S.C. § 831(b) was applicable.[10] Thus, the absence of any warning to Dowell precluded receipt of his statements in evidence.

### III

At the time of the interview with appellant, Captain Black knew that Dowell was represented by Captain Gasperini. Appar-

8. Of course, Captain Black did not try to incorporate by reference any warnings to Dowell that might have been given by the CID agents; he was unaware at the time that they had already interviewed appellant.

9. Regardless of any change in the applicable rule of evidence, *see* Mil.R.Evid. 304h (3), effective September 1, 1980, the reality of human nature remains the same.

10. On the same reasoning, these actions by Captain Black were the "functional equivalent" of "custodial interrogation."

ently this representation extended to all the charges preferred by Captain Black against the appellant. Nonetheless, Captain Black believed that he had no obligation to advise the defense counsel of his visit to the stockade.

The danger here of interference with the accused's right to counsel is not unlike that which concerned us in *United States v. McOmber, supra.* There we ruled that if the right to counsel, provided in Article 27, UCMJ, 10 U.S.C. § 827, is to retain its vitality, then a military investigator who is .on notice that a service member is represented by a lawyer in connection with the criminal investigation he is conducting may not question that person without affording counsel a reasonable opportunity to be present. Of course, Captain Black can be distinguished in some respects from the investigators involved in *McOmber.*[11] Nonetheless, he was the accuser—the very person who swore to the charges against the appellant. Moreover, his encounter with the accused to inform him of the charges was a mandatory initial step towards trial. It went far beyond delivery of a check or inquiry into Dowell's health and welfare.

■ In this context, any interrogation of an accused is subject to the same requirement announced in *McOmber*—namely, that counsel must be provided an opportunity to be present. Since informing an accused of the charges preferred against him is the "functional equivalent" of interrogation because it tends to induce the making of a statement—as discussed in earlier parts of this opinion—the practical result is that the accused's lawyer must be notified before any such interview with the accused takes place with respect to the offense charged. Even mere listening to the accused's comments on the charges is not immune from this requirement. Evidence which has been obtained in violation of this requirement is inadmissible.

## IV

We have examined the record closely to determine whether the accused's sworn testimony at trial constituted a judicial confession to the aggravated assault of which he was convicted or whether it sufficed to raise an issue of self–defense. The question is very close; but, taking all the evidence in context and resolving every doubt in appellant's favor, we conclude that self–defense was raised and that admission of the statement made by appellant to Captain Black may have been prejudicial as to that issue.

The decision of the United States Army Court of Military Review is reversed as to the offense of aggravated assault and the sentence. The findings thereon are set aside. The record of trial is returned to the Judge Advocate General of the Army for submission to a convening authority, who may dismiss the aggravated assault charge and reassess the sentence based on the remaining findings of guilty, or order a rehearing on the aggravated assault charge and the sentence.

Judge FLETCHER concurs.

COOK, Judge (dissenting):

## I

## CAPTAIN BLACK'S OBLIGATION TO COMPLY WITH THE McOMBER RULE.

The majority's declaration, in Part III, that Captain Black's notification to the accused that an additional charge had been preferred against him was "the 'functional

---

11. *McOmber* involved a military investigation of the same offense in which defense counsel represented the accused. In *United States v. Lowry*, 2 M.J. 55 (C.M.A. 1976), we extended the *McOmber* mandate to an interview of an accused about an offense related to that for which counsel had been appointed. However, the line was drawn in *United States v. McDonald*, 9 M.J. 81 (C.M.A. 1980), where the

Court declined to hold the *McOmber* rationale applicable to an independent civilian investigation into an offense unrelated to that in which the accused was represented by defense counsel. The present case involves discussion of military offenses related to the charges for which defense counsel was representing appellant. *See United States v. Lowry, supra.*

equivalent' of interrogation" and, thereby, obligated Captain Black to comply with the rule in *United States v. McOmber*, 1 M.J. 380 (C.M.A. 1976), impels me to immediate disagreement. The majority acknowledge that under paragraph 32*f*(1), Manual for Courts–Martial, United States, 1969 (Revised edition), a unit commander, like Captain Black, has the "duty to inform . . . [an] accused of the charges against him." The Manual paragraph effectuates the requirement of Article 30(b), Uniform Code of Military Justice, 10 U.S.C. § 830(b), that "the person accused shall be informed of the charges against him as soon as practicable."

Substantively, the present Manual provision is identical to the same numbered paragraph in the Manual for Courts–Martial, United States, 1951, which was promulgated upon enactment of the Uniform Code. The responsibility was, therefore, part of the complex of duties and responsibilities that was complained of as constitutionally disqualifying a commander from serving as a "neutral and detached magistrate." After deliberating on that matter for more than 3 years, the Court unanimously held that a commander is not inherently disqualified to act with such neutrality and detachment. *United States v. Ezell*, 6 M.J. 307, 318 (Perry, J.); 6 M.J. 326, 330 (Fletcher, C. J., concurring); 6 M.J. 330, 331 (Cook, J., concurring in part and dissenting in part). The Court propounded an alternative test to determine whether a commander is disqualified in a particular instance. As enunciated by Judge Perry, the test was stated as follows: (1) Disqualification results "when the military commander becomes personally involved as an active participant in the gathering of evidence"; or (2) the commander "otherwise demonstrates personal bias or involvement in the investigative or prosecutorial process against the accused." *Id.* at 318.

I cannot conceive how advising an accused, as the Manual requires, that a formal charge of a violation of the Uniform Code has been lodged against him involves the commander "as an active participant in the gathering of evidence" against the accused.

Were that true, no magistrate or judge could preside at a detention hearing of one charged with a crime because one of his judicial responsibilities at such hearing is to apprise the accused of the charge against him. Fed.R.Crim.P. 5. Nor can I conceive any reasonable basis upon which to justify a conclusion that the giving of notice of the existence of a charge is proof of "personal bias" against the accused or constitutes "involvement in the investigative or prosecutorial process." Consequently, I reject out–of–hand any imputation that, in apprising the accused of the additional charge, Captain Black was "the 'functional equivalent' " of an investigator.

The obligation to apprise accused's counsel of an intended interrogation of him was created in *United States v. McOmber, supra*. The rule was stated as follows:

> We therefore hold that once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code.

1 M.J. at 383.

Although Captain Black was not, as I indicated, an investigator, the majority say that in advising the accused of the additional charge, he engaged in "the 'functional equivalent' of interrogation." I shall presently discuss whether Captain Black was required to advise the accused of the right to remain silent, as provided by Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, which is the subject of Part II of the majority opinion. Here, the issue is the applicability of the *McOmber* rule, which imposes the obligation to give notice to an accused's counsel of an intended interrogation only upon a particular kind of interrogator, specifically an interrogator who is engaged in the discovery of evidence of a crime. I have already pointed out that, in my opinion, Captain Black was not so engaged when he was carrying out his duty to

notify the accused of the new charge against him. Consequently, *McOmber* does not, in my opinion, apply to him, either by the text of the opinion or, as the majority posit, by analogy.

## II

A COMMANDER WHO VISITS A MEMBER OF HIS COMMAND IN CONFINEMENT FOR A HEALTH AND WELFARE INQUIRY IS NOT REQUIRED BY ARTICLE 31(b), 10 U.S.C. § 831(b) OF THE UNIFORM CODE TO ADVISE THE CONFINEE THAT HE HAS A RIGHT TO REMAIN SILENT.

In my judgment, Point II of the majority opinion misapprehends an essential element in the relationship between a military commander and his unit subordinate. An Army Regulation synthesizes the responsibilities of a commander in the reminder that "[s]econd only to accomplishing their military mission, leaders are responsible for the welfare of their troops." AR 600–20, c. 3, para. 5–7e (June 22, 1973).

Years ago, I set out some of the reasons that convince me that Article 31, 10 U.S.C. § 831 of the Uniform Code does not mandate that whenever a commander has reason to suspect that a subordinate has engaged in conduct violative of the Uniform Code, he must precede communication with him with advice that the subordinate has a right to remain silent. *United States v. Seay*, 1 M.J. 201, 204 (C.M.A. 1975). As I remarked in my separate opinion in *Seay*, to require such preliminary advice in every instance is likely "to defeat the purpose" of a particular interchange between the commander and his subordinate that is entirely separate from investigation or prosecution of the suspected offense. *Id.* at 205.

Captain Black testified that he visited the accused in pretrial confinement for three reasons, but with respect to one, delivery of a pay check, he later acknowledged that, as a result of the further questioning of him he was not sure he "did take a check down there this last time." Effectively, there-

fore, he attributed his visit to two reasons: (1) "to accomplish" a "health and welfare" visit, as prescribed by regulation; and (2) to read to the accused the "additional charge that showed up." The majority ascribe to the reading of the additional charge "the natural tendency to induce" the accused to speak out. From that natural tendency, they deduce an obligation to advise the accused of the right to remain silent. Never since the enactment of the Uniform Code has the Court previously intimated that advice as to the right to remain silent under Article 31(b), 10 U.S.C. § 831(b), of the Code must be preliminarily provided to an accused before such reading of a charge. I reject the contrary rule now imposed by the majority. I do so for three reasons. First, the majority's reliance upon the concept of an "admission by silence" is wholly inapposite. The discussion of the concept in paragraph 140a(4) of the Manual, which was then in effect, indicates that, in certain circumstances, the reasonably expected response by a person accused of a serious crime is not an incriminating statement, but a denial of guilt. Consequently, goes the concept, the failure to deny implies guilt. Here, the accused *was not silent*, so there is no foundation whatever for an "admission by silence." Secondly, "admission by silence" applies only when the circumstances "reasonably call for a denial" but no denial is forthcoming. Apprising an accused of the existence of a formal charge against him, whether by a police officer or by a court, imposes no obligation upon the accused to speak. *See Baxter v. Palmigiano*, 425 U.S. 308, 316–17, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976); *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). The current rule, Mil.R.Evid. 304 h(3), Ch. XXVII, Manual for Courts–Martial, United States, 1969 (Revised edition), provides that the "failure to deny an accusation" by a person "under official investigation or ... in confinement ... does not support an inference of an admission of the truth of the accusation." Consequently, there can be no "admission by silence" resulting from the mere reading of a charge. Thirdly, I do not understand how an eviden-

tiary inference predicated upon a failure to speak can logically be transformed into an obligation to advise an individual he has a right to remain silent. Under Article 31(b), 10 U.S.C. § 831(b), the obligation to provide preliminary advice on the right to remain silent arises only when the purpose is to "interrogate, or request any statement . . . regarding the offense" from the accused. As prescribed by paragraph 32f(1) of the Manual, the duty to advise an accused of formal charges contemplates nothing more than "inform[ing] the accused of the charges" and the "sign[ing of a] certificate to that effect on the charge sheet." I unqualifiedly reject any suggestion that the requirement is a subterfuge for inducing incriminating statements from an accused. I conclude, therefore, that the reading of the additional charge did not obligate Captain Black to advise the accused that he had a right to remain silent, as provided by Article 31, 10 U.S.C. § 831 of the Code, or as provided for "custodial interrogation" Under *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

Turning to Captain Black's purpose, and obligation, to inquire into the accused's "health and welfare," I have no doubt that, facially, it is so foreign to the idea of an interrogation of an accused in regard to misconduct as not to be within the scope of Article 31, 10 U.S.C. § 831. *United States v. Seay, supra; United States v. Carlisle,* 22 U.S.C.M.A. 564, 48 C.M.R. 71 (1973); *United States v. Beck,* 15 U.S.C.M.A. 333, 35 C.M.R. 305 (1965); *United States v. Valdez,* 38 C.M.R. 602 (A.B.R. 1967), *pet. denied,* 17 U.S.C.M.A. 662, 38 C.M.R. 441 (1968). *Cf. United States v. Jordan,* 20 U.S.C.M.A. 614, 44 C.M.R. 44 (1971) ("office hours" inquiry into report of wrongful conduct by accused). A health and welfare inquiry of a person in confinement implicitly invites him to speak freely. To advise him that whatever he says can be used against him in a court–martial is patently antithetical to the invitation to speak and tends to negate the purpose of the inquiry. *Cf. United States v. Simpson,* 17 U.S.M.C.A. 44, 37 C.M.R. 308 (1967). This is not to say that what starts out as a health and welfare inquiry can

never change into an encounter that is subject to Article 31, 10 U.S.C. § 831. *See United States v. Hall,* 1 M.J. 162 (C.M.A. 1975). As the majority imply that advice as to the right to remain silent must be given at the outset of the inquiry, I am impelled to state that, in my opinion, a commander who goes to a confinement facility to talk to a member of his command confined therein about matters pertaining to the subordinate's "health and welfare" is not obligated by Article 31(b), 10 U.S.C. § 831(b) of the Uniform Code to advise him, first, that he has a right to remain silent and that anything he says can be used against him in a court–martial trial.

### III

### THE NATURE OF THE HEALTH AND WELFARE DISCUSSION BETWEEN A COMMANDER AND A CONFINED ACCUSED.

My conclusion that a health and welfare inquiry is not within the ambit of Article 31(b), 10 U.S.C. § 831(b), does not dispose of the question of the admissibility of the statements made by the accused during the inquiry. Although he overruled defense counsel's objection to the admission into evidence of accused's disclosures, the trial judge acknowledged "merit" in counsel's contention that Captain Black should have, "at least," informed the accused that, if he talked about the offenses, his statements could be used against him. However, the judge remarked that he was "not aware of any law" under which Captain Black's omission "would render . . . [them] inadmissible." In my opinion, the trial judge erred in his view of the law.

In *United States v. Seay, supra,* I noted that an interchange between a commander and a subordinate can be invested with a promise of confidentiality that renders inadmissible at a court–martial statements made by the subordinate.

The concept that promised confidentiality by a commander renders a statement by a subordinate inadmissible in evidence at a court-martial is not new to military law. It

was first remarked, by way of an hypothesis, a quarter of a century ago. *United States v. Payne*, 6 U.S.C.M.A. 225, 19 C.M.R. 351 (1955).[1] Three years after *Payne*, the rule was expressly propounded and applied. *United States v. Washington*, 9 U.S.C.M.A. 131, 133, 25 C.M.R. 393, 395 (1958). There, one of two questions before the Court was "whether a pretrial statement made by the accused to his acting company commander ... [was] admissible in evidence." *Id.* at 132, 25 C.M.R. at 394. The Court answered as follows:

> We all agree that a statement is inadmissible, despite advice to the accused of his rights under Article 31 of the Uniform Code, 10 U.S.C. § 831, if the accused is informed at the time of the advice by a competent person that whatever he says will be held in confidence between them. A representation of that nature tends to induce a belief in the mind of the accused that his disclosure will *not* be made the basis for a criminal prosecution.

*Id.* at 132–33, 25 C.M.R. at 394–95.

In my opinion in *Seay*, I noted that a promise of confidentiality may inhere in the nature of a particular inquiry by a commander. Earlier, I indicated that a personal health and welfare visit by a commander to a subordinate in confinement is implicitly calculated to encourage the subordinate to unburden himself. The record demonstrates that is precisely how the accused reacted to Captain Black's visit.

Captain Black testified he sat with the accused in the interview room of the confinement facility. He said that his first remark was, "Well, how is it going?" The accused's answer was, "I'm depressed"; then "after he had made the statement that he was depressed, he started talking about

one of the initial charges." At that point, Captain Black told the accused he did not have to "make any statements in front of me." The accused persisted, and "started to discuss the entire" situation he was in. The captain "got the feeling" that the accused had "just kind of give[n] up the ship." He interrupted the accused to tell him he was not there "to conduct a hearing" so the accused "did not have to make any comments" to him, "if he did not care to." But, as Captain Black admitted, the accused "continued, so, obviously, he cared."

Arguably, Captain Black's statement may have sufficed to apprise a reasonably prudent and emotionally–controlled person that he should not regard their conversation as confidential. *United States v. Cudd*, 6 U.S.C.M.A. 630, 635, 20 C.M.R. 346, 351 (1956) (Latimer, J.). I am not sure, however, that they would convey that idea to a person in the grip of an emotional state like that of the accused. For the purpose of this case, I assume that Captain Black's words fell short of dispelling the promise of confidentiality implied in the nature of the meeting with the accused. As in *Seay*, therefore, the accused's statements were inadmissible, over his objection, at his court–martial trial.

## IV

ERROR IN THE ADMISSION OF EVIDENCE DOES NOT AUTOMATICALLY MANDATE REVERSAL OF FINDINGS OF GUILTY. ALSO TO BE CONSIDERED IS WHETHER THE ERROR PREJUDICED THE ACCUSED.

Two standards obtain for determination of the prejudicial effect of error in the

---

1. In *Payne*, the accused was apprehended for wrongful use of narcotics. After a period of questioning by agents of the CID that produced no incriminating admission, an agent remarked to the accused, "Man to man, just between you and I [sic], when was the last time you used narcotics?" The accused laughed, then admitted that he "took it" the previous day. Writing for the Court, Judge Latimar upheld the admissibility of the accused's statement, but he explicitly remarked that "[n]o command status

was involved" and "no ... promise, express or implied, that any disclosure would be kept confidential, was made." *United States v. Payne*, 6 U.S.C.M.A. 225, 228, 19 C.M.R. 351, 354 (1955). In his separate opinion, Chief Judge Quinn also indicated his belief "that 'a promise of secrecy' ... made by a commanding officer" was different from a similar promise during an interrogation of an accused by a police officer. *Id.* at 230, 19 C.M.R. at 356.

admissibility of evidence. The first applies to an error of constitutional dimension; under that standard, the reviewing tribunal must be convinced beyond a reasonable doubt that the error was harmless to the accused. *United States v. Hunter*, 7 M.J. 287 (C.M.A. 1979); *United States v. Ward*, 1 M.J. 176, 180 (C.M.A. 1975). The prejudicial effect of an erroneous ruling in the exclusion or reception of evidence that does not violate a constitutional right of the accused is determined by whether the record presents a "fair risk" that the inadmissible evidence "influenced the verdict." *United States v. Woolery*, 5 M.J. 31, 33 (C.M.A. 1978); *United States v. O'Berry*, 3 M.J. 334, 336 (C.M.A. 1977). A special situation exists as regards a violation of Article 31, 10 U.S.C. § 831 because of the unique role that article has in military law. Consistently, the Court has held that the erroneous admission into evidence of statements obtained from an accused in violation of Article 31, 10 U.S.C. § 831 constitutes reversible error "regardless of the compelling nature of the other evidence of guilt." *United States v. Hall, supra* at 163; *United States v. Ward, supra* at 179 n. 3. However, the Article 31, 10 U.S.C. § 831 rule is inapplicable when, not impelled by an erroneous ruling by the trial judge admitting pretrial statements, the accused testified in his own defense and judicially admitted the same incriminatory statements as those allowed into evidence under the judge's ruling. *United States v. Sikorkski*, 21 U.S.C.M.A. 345, 45 C.M.R. 119 (1972); *United States v. Trojanowski*, 5 U.S.C.M.A. 305, 17 C.M.R. 305 (1954). Measured by the most stringent of these standards, the accused was patently not prejudiced by the inadmissible testimony of Captain Black.

According to the majority, the accused's statements to Captain Black regarding the aggravated assault were inadmissible because, as indicated in Part II of their opinion, they were obtained in violation of Article 31, 10 U.S.C. § 831. However, the accused testified and, as I read his testimony,

he not only repeated the incriminating admissions that he made to Captain Black but added substantial detail. Consequently, unless the accused was compelled to testify because of the judge's erroneous ruling, the error was harmless. *United States v. Trojanowski, supra* at 313, 17 C.M.R. at 313. *See also United States v. Dusenberry*, 23 U.S.C.M.A. 287, 49 C.M.R. 536 (1975). The record convinces me that the accused testified, not because he was constrained to do so by the judge's ruling on Captain Black's testimony, but as part of a predetermined defense tactic, which included testimony by other defense witnesses, to challenge the legitimacy of the severity of the charge that was lodged as a result of his fight with Moore.[2] He succeeded. As he voluntarily and judicially acknowledged the facts determined by the majority to be inadmissible because obtained in violation of Article 31(b), 10 U.S.C. § 831(b), the alleged error is harmless.

In Part III of their opinion, the majority maintain that Captain Black also violated the *McOmber* rule by failing to notify accused's counsel of his intended health and welfare inquiry of the accused. Although the notification rule is judicial in origin, the Court related it to accused's rights under Article 31 of the Code, 10 U.S.C. § 831. *United States v. McDonald*, 9 M.J. 81, 83–84 (C.M.A. 1980). As the majority characterize Captain Black's reading of the additional charge as "the 'functional equivalent' of interrogation," the resultant picture of the accused's situation is that he was being subjected to "custodial interrogation." *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A violation of an accused's rights at a custodial interrogation is constitutional in nature. Consequently, the test for prejudice in the majority's formulation of the error is whether we can conclude, from the entire record, that the error was beyond a reasonable doubt not harmful to the accused. The entire record obviously includes

---

**2.** The charged offense, maiming, subjected the accused to punishment that included confinement at hard labor for 7 years. Table of Maximum Punishments, para. 127c, Manual for Courts–Martial, United States, 1969 (Revised edition).

the testimony of the accused and his witnesses. As I have already pointed out, the accused admitted matter from the stand that went far beyond the admissions he made to Captain Black. In my opinion, a fair reading of the entire record would impel a reasonable person to conclude, beyond a reasonable doubt, that Captain Black's testimony did not adversely influence the trial judge's findings, which absolved the accused of the offense of maiming but held him responsible for aggravated assault.

I would affirm the decision of the United States Army Court of Military Review.