UNITED STATES, Appellee,

v.

Private First Class Lloyd SHANKS, Jr., SSN 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, United States Army, Appellant.

CM 440518.

U. S. Army Court of Military Review.

30 April 1982.

---

**784**

---

Major Raymond C. Ruppert, JAGC, Major James F. Nagle, JAGC, Captain Edwin S. Castle, JAGC, and R. Stuart Broom, Esquire, were on the pleadings for appellant.

Colonel R. R. Boller, JAGC, Major John T. Edwards, JAGC, Major Michael L. De-Busk, JAGC, and Captain Gary L. Hoffman, JAGC, were on the pleadings for appellee.

Before MITCHELL, MILLER and LEW-IS, Appellate Military Judges.

## OPINION OF THE COURT

MITCHELL, Senior Judge:

What may be metaphorically described as a sneak reprisal attack in a miniature drug war at a military base has brought to this Court an appeal of a conviction of double murder. The court below, composed of officer members, found appellant guilty of conspiracy to commit murder, premeditated

murder of Zollie Richardson, murder without premeditation of Howard Steele, and communication of a threat.[1] He was sentenced to a dishonorable discharge, confinement at hard labor for life, and forfeiture of all pay and allowances. The convening authority approved the sentence.

As noted, this case involves the most serious crimes of violence[2] of which appellant has been convicted and sentenced to prison for the term of his natural life. For this reason, although we affirm the judgment of the trial court as approved by the convening authority, we feel compelled to discuss two matters extensively litigated at trial and assigned as errors by appellate defense counsel. These involve the evidentiary sufficiency of the findings of guilty of conspiracy and murder. The others, not discussed, we also find to be without merit.

### I

The charged offenses arose out of the gangland-type slaying of Zollie Richardson and Howard Steele as their car moved along a deserted road in a remote area of Fort Polk, Louisiana. An autopsy revealed that Richardson had died as a result of three penetrating bullet wounds to the back of the head. Steele died as a result of two penetrating bullet wounds entering the left side of the head. No firearms were found in the car or on the bodies of the victims. Both were civilians who resided in the nearby town of DeRidder.

The Government concedes that Private Johnson, a Fort Polk soldier who pulled the trigger, was the actual perpetrator but insists the evidence establishes that appellant helped plan the crime and shared the same intent so as to support an aider and abettor theory. We agree and now summarize Government's evidence presented at trial that, in our opinion, establishes appellant's guilt of conspiracy and murder beyond a reasonable doubt.

---

1. This was in violation of Articles 81, 118 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 918, and 934 (1976).

2. The convening authority referred the case as capital, a conviction for which the penalty is death.

## II

Appellant and Johnson were threatened and forced at gun point by Richardson to purchase some "cocaine" that later proved to be pulverized salt. Enraged by Richardson's arrogance and deception, both appellant and Johnson independently vowed to kill him.[3] Consequently, when Richardson telephoned appellant to apologize for his corrupt behavior, appellant, by a "Judas kiss"[4] pretense of pardon, accepted Richardson's invitation to meet him on post where "now the man was coming to his house and the rules would be played differently."[5] Johnson and the appellant had also discussed by telephone Richardson's impending visit. The appellant judicially admitted he told Johnson in the course of one such conversation that he would beat Richardson with a sledge hammer. Meanwhile, Johnson obtained a handgun from Specialist 4 Anthony Walker and arranged for an alibi for both himself and appellant. Later, in the presence of appellant, Johnson brandished the pistol and uttered threats to kill Richardson.[6] Richardson arrived on post accompanied by an "associate" Howard Steele. Johnson, appellant, Richardson, and Steele got into Richardson's car and together they drove away from the barracks area.

A short while later, Johnson, sitting on the rear seat with appellant, summarily shot Richardson in the back of the head. Immediately thereafter, Johnson shot Steele. Simultaneously, appellant and Johnson jumped from the careening vehicle and fled to their quarters. In an effort to obtain Specialist Walker's immediate assistance in disposing of the handgun, Johnson, in the presence of appellant, told him "that they had just blown two guys away." Further efforts to conceal their crimes were made when Johnson threatened Private First Class Guyot, to which appellant nodded in agreement.[7] And, when appellant told Private First Class Michael Walker he not only wanted Walker to provide an alibi, he greatly expanded its scope.[8] Finally, the next day when Mrs. Menard, a fellow clinic employee, upon learning of the double murder and remembering appellant's earlier threats, accused appellant of the crime, he turned pale and fled the hospital.

## III

To us, these facts prove beyond a reasonable doubt that appellant and Private Johnson entered into a conspirational agreement. Both announced an intention to kill

3. "I'll get him. I don't mess around when it comes to money." "... this man [Richardson] thought he was a real bad dude because he was from Philly and he said he [appellant] was from Atlanta and he was a bad dude too and he would show him." Richardson, a former soldier whose original home was in Philadelphia, was reportedly discharged from the service because he unlawfully shot at an Army colonel. "He [appellant] stated that he had made arrangements to meet this man [Richardson] at the barracks that evening and that he was going to take care of him when he came."

"He [appellant] said he was going to find a sledge hammer and hit the man over the head with it. If he could not find a sledge hammer, then he would find a gun and shoot him." Testimony of Government witnesses.

4. Reference: St. Matthew 26:48–49 (King James Version).

5. Three days earlier at Richardson's civilian quarters, appellant had been forced at the point of Richardson's gun to "loan" Johnson $100.00 so he could purchase the "cocaine" that later turned out to be salt. He respected Richardson's "home court" advantage but vowed to get even when it shifted to Fort Polk.

6. After arriving at Fort Polk Richardson got out of his car and entered the barracks. Steele remained in the vehicle. Johnson, brandishing the handgun, said to appellant, "I'll get him."

7. "We killed them so don't tell nobody or else we're going to kick your [posterior]."

8. After luring Richardson into the barracks, they intended to recover the money they had lost on the fake drugs, then kill him and throw his body out a window. PFC Walker was to then circulate a rumor that Richardson had been caught in the barracks while in the act of stealing. Additionally, at appellant's urging, Walker was to claim that the two conspirators were in his room drinking and could not have committed the act. We can only speculate that when they discovered that Steele, an unwanted witness, had accompanied Richardson, they decided to move the execution to a more remote area of the post where both civilians could be permanently dispatched with less chance of detection.

Richardson and the means by which it would be accomplished. Each participated in furthering the scheme, appellant lured Richardson on post while Johnson obtained the handgun. The two were constantly together from the time Richardson arrived until long after the murders were committed.[9] This was more than "mere presence" on the part of appellant.[10] He co-authored the machination and helped direct its grim production in a style reminiscent of Brutus and Cassius plotting the assassination of Julius Caesar in ancient Rome. He remained by Johnson's side and assisted him in covering up the crimes. *See United States v. Mesa*, 660 F.2d 1070, 1074–5 (5th Cir. 1981). Moreover, when appellant was accused by Mrs. Menard of having committed the slayings, he did not then deny the accusation as any wrongfully accused person would normally do. Instead, he blanched and ran. His actions were not consistent with innocence, but on the contrary provided a compelling inference of being an aider and abettor and therefore a principal. Article 77(1), Uniform Code of Military Justice, 10 U.S.C. § 877(1); paragraph 156, Manual for Courts-Martial, United States, 1969 (Revised edition). *See United States v. Dowell*, 10 M.J. 36, 40 (C.M.A. 1980); *United States v. Brown*, 50 C.M.R. 594, 597 (A.C.M.R.1975).

While it is clear that the object of the conspiracy between appellant and Johnson was to murder Richardson, appellant did not withdraw from the conspiracy when Steele unexpectedly arrived at the barracks with Richardson. Instead, they pursued their course of action. As a consequence, Johnson's killing of Steele, apparently to prevent his identification of Richardson's killers, was as a matter of law attributable to appellant. *See Shockley v. United States*, 166 F.2d 704, 715 n.6 (9th Cir. 1948).

The findings of guilty and the sentence are affirmed.

Judge MILLER and Judge LEWIS concur.

9. We are reminded of the common saying among the early Puritans, "So thick together they walk in the snow yet leave they one set of tracks."

10. Appellant even judicially admitted that Johnson had told him before he got in the car with the victims that he intended to kill Richardson if Richardson did not give back Johnson's money. The appellant denied knowing that Johnson had a gun but believed Johnson could do it with his hands. This stretches our credulity too far. The appellant would have us believe that he entered a car driven by Richardson, who had a reputation for armed violence and who had robbed appellant with a gun only a few days before, in order to be driven elsewhere on Fort Polk to see his cousin. He did so with full knowledge of Johnson's purpose and state of mind and the presence of Richardson's "associate" Steele. There can be no doubt that Johnson would not have undertaken to merely injure or frighten such a dangerous individual as Richardson. Retribution would be both extreme and certain. The appellant's situation is the same.