UNITED STATES

v.

**Sergeant Craig J. BRABANT, FR 562–45–6223, United States Air Force.**

**ACM 26547.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 27 Oct. 1987.

Decided 20 July 1988.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Major Deborah A. Baker.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Carole W. Hanson.

Before FORAY, MICHALSKI and MURDOCK, Appellate Military Judges.

## DECISION

MURDOCK, Judge:

This case considers the delicate balance that must be maintained between responsibilities as a military supervisor and the provisions of Article 31, UCMJ, 10 U.S.C. § 831, and other limitations on questioning suspects. The appellant was found guilty of theft of a motorcycle and sentenced by a court-martial consisting of members, to a bad conduct discharge, confinement for two years, forfeiture of $100.00 per month for 10 months and reduction to airman basic. He asserts, as he did at trial, that the pretrial statement he made to his supervisor should have been suppressed. We agree.

The victim routinely parked his motorcycle in a lot near one of the base gates because he had not taken the safety course required for him to ride his vehicle on base. The motorcycle attracted the appellant's attention and he began to make inquiries about who owned it. This may have been because he had recently purchased a nonworking motorcycle of essentially the same kind. Eventually, the motorcycle was stolen. Before the owner knew it was gone, the motorcycle had been taken, stripped, and the frame abandoned in an open field.

The abandoned frame was discovered and the California Highway Patrol (CHP) was notified. The CHP contacted the owner, an airman stationed at Norton Air Force Base, and, at their suggestion, he reported the theft to the base security police.

About ten days later a base security police investigator contacted the CHP and said they had a suspect (the appellant) in the motorcycle theft case. The CHP and security police investigators agreed to go to the appellant's off-base apartment. When they arrived they sought and obtained his consent to search his carport including a large packing crate which contained a collection of parts. In the crate they found a motorcycle gas tank and a fairing that matched the description of those taken from the victim's motorcycle. When the police returned to the base they had the victim test his gas cap key in the tank they had seized. It fit.

The appellant was a security policeman who normally worked the "midnight" shift. He was relieved of police duties as soon as he became a suspect in this case, but he was still required to report to security police headquarters and spend his normal shift. Sometime after he had been relieved, the appellant was questioned by the security police investigator. After the investigator read him his rights, the appellant exercised his right to remain silent and requested a lawyer. This occurred around 0200 during a normal duty period for the appellant.

■ The assertion of error concerns what happened next. The investigator ended the session as soon as the appellant requested a lawyer. Shortly after the session ended one of the security policemen who had helped the appellant take and strip the motorcycle submitted a sworn statement to the investigator explaining how he and another security policeman had helped the appellant. The investigator contacted Captain Michael Gathright, who was the squadron operations officer, acting commander, and appellant's second level supervisor. Captain Gathright asked the investigator to have the appellant stand by in the police station and report to him at 0730.

The appellant reported to the captain as ordered. To understand the meeting being complained of, we turn to Captain Gathright's testimony at the hearing on the motion. We include it to facilitate the discussion of this error and also to demonstrate how easily a situation like this can arise in a military setting where supervi-

sors have both a supervisory and an Article 31, UCMJ, role:

A: As soon as he reported, I got the feeling that he wanted to make a comment and I understood from the investigator that he did want a lawyer and I says, "Say nothing." And he says, "Yeah, but—" I said "don't say anything. You need to go see a lawyer." And at that time he made a spontaneous comment.

Q: And what was the content of the comment that he made spontaneously?

A: To the best of my memory, his comment was "What can I do to make this right? I'll sign over my motorcycle; I'll give him my pink slip, Article 15, lose a stripe, whatever."

Q: And those are his words as best you can recall them?

A: Yes.

Q: Now, you indicated that you had interrupted him on one occasion and attempted to tell him to shut up essentially, is that correct?

A: To the best of my memory, it was actually twice.

Q: Now, in calling him in to your office, was it your intention to elicit some information from him?

A: Absolutely not. Usually when an investigation just begins, especially after the first interview, the accused and the witnesses really don't know what's going on to the extent of the trouble they may be in or what the next step is and I just wanted to impress upon him that this was serious and he needed to go see a lawyer first thing in the morning.

Q: Did you ever state anything in the question format as to what sort of trouble he was in, anything of that nature?

A: Not to my knowledge.

Q: Once he'd made the statement, wanting to make it right and that he would sign his motorcycle over, and so forth, what did you do at that point?

A: Again I says, you know, "Don't say anything else until you go talk to your lawyer." This was a very brief meeting.

Q: What was the total length of the meeting?

A: It couldn't have been more that a minute and a half, two minutes, long, just a quick report in and a returned salute, and then he left.

This meeting illustrates the difficult line we must follow when we apply civilian cases and concepts to the military environment. In this case the captain was squeezed between his responsibilities as a supervisor and the limitations placed on him by Article 31, UCMJ. Civilian supervisors are seldom in this bind because it is rare for their questioning to trigger the protections of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and their associated cases. However, even in a civilian situation, where the supervisor is a police officer, and the meeting takes place in the police station there is very little the supervisor can say to the worker after the worker has invoked his rights to silence and counsel. In the present case the captain was trapped by both his status as a person subject to the UCMJ (therefore triggering Article 31, UCMJ) and by his status as a law enforcement officer. These dual concerns outweighed his status as a supervisor and should have guided his actions.

Were it not for the prohibition of *Edwards* we would hold that the meeting had a benign purpose and did not taint the cryptic statement made by the appellant. In many ways the meeting can be viewed as merely a reinforcement of the rights warning given earlier by the investigator. What is important is whether the session was one the captain knew or should have known was likely to trigger an incriminating response. *See United States v. Dowell,* 10 M.J. 36 (C.M.A.1980). We are not convinced the captain had any improper motives in calling the appellant in to refresh him on the importance of seeking counsel.

Police contact with an accused once he has requested counsel has generated considerable debate. At times the outcome of a case has seemed to hinge on very narrow distinctions. *See Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77

902

L.Ed.2d 405 (1983). In the present case there are no distinctions worth deviating from the mandate of *Edwards*. In *Edwards* terms, the facts are these: (1) the accused was questioned by a police investigator at the police station, (2) he elected to remain silent and to ask for a lawyer, (3) questioning stopped but he was ordered to stand by until the captain could talk with him, and (4) without any modification of his rights elections the accused was required to present himself to a supervisory law enforcement officer. In our view *Edwards* requires the police to "go away" for a reasonable time once an accused has requested a lawyer. *See Arizona v. Roberson,* — U.S. —, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). They violated this standard in the present case by requiring the appellant to face another police official before he had a chance to seek and consult counsel. The statements he made to Captain Gathright should have been suppressed.

█ The cases which make up the exclusionary rule do not mandate reversal every time tainted evidence is admitted. *United States v. Remai,* 19 M.J. 229 (C.M.A.1985). Rather, each case is analyzed to see whether there is sufficient admissible evidence to sustain the conviction and whether the inadmissible evidence has impermissibly tainted the remaining evidence. In the present case the inadmissible evidence was quite limited and most likely had only a minor effect on the ultimate outcome of the case. Captain Gathright's testimony before the members takes only 10 pages of the 391 page record. Only three questions, totalling two and one half inches of text, concern the inadmissible evidence, and one of those was asked by the defense.

Arrayed against this small amount of inadmissible testimony is an overwhelming amount of admissible evidence of the appellant's guilt. The appellant's two accomplices both testified that they had helped him load a motorcycle into a security police van, driven to a remote part of the base, and spent the next two or three hours disassembling the motorcycle and loading it into the appellant's vehicle. This disassembly was done in the early morning hours with only the moon and distant runway lights for illumination. A CHP patrolman testified about discovering the discarded frame of the motorcycle and going to the appellant's apartment where he conducted a consent search of the carport. During that search the patrolman, assisted by the security police investigator, found several items that matched the stolen motorcycle. For example, the gas tank was the same type as the stolen one, had a dent in the same place, and the owner's key opened the gas cap. Two security policemen testified that the appellant had told them that he intended to steal the motorcycle that was eventually stolen. Three security policemen placed the appellant in the parking lot where the theft occurred at an appropriate time for him to have committed the theft. Another security policeman testified he saw the appellant using the California Law Enforcement Terminal System, a computer system which provides information on vehicle registration, to make repeated inquiries about the motorcycle which was later stolen.

We do not intend this listing of the government's evidence to be complete. Further, we do not mean to imply that the defense did not present any evidence to the contrary. Proof beyond a reasonable doubt does not mean evidence free from all doubt. *United States v. Lee,* 22 M.J. 767 (A.F.C.M.R.1986), *pet. denied* 23 M.J. 406 (1987). The test is whether there is, in the record, some competent evidence from which the members of the court-martial, or the military judge in a trial by judge alone, could find, beyond a reasonable doubt the existence of every element of the offense charged. *United States v. Taylor,* 21 U.S. C.M.A. 220, 44 C.M.R. 274 (1972). We are satisfied, as was the court-martial, that every element of the offense charged was proved beyond a reasonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The findings and the sentence are

AFFIRMED.

Senior Judge FORAY concurs.

MICHALSKI, Judge, (dissenting):

Although I concur that the statements made to Captain Gathright should have been suppressed, I do not concur with the majority's conclusion that this inadmissible and highly damning evidence was "quite limited and most likely had only a small effect on the ultimate outcome of the case."

This assessment of the government's evidence is clearly at odds with the government's own on the scene evaluation of the importance of Gathright's testimony contained in trial counsel's opening statement. The government's representative at trial characterized it as "very important." This description of the forthcoming testimony certainly must have caught the attention of the triers of fact to be especially aware of what this witness had to say. I am confident that trial counsel was keenly aware how critical this evidence was to assuring appellant's conviction. Otherwise, why would he have drawn so much attention to it?

Although there was a good amount of circumstantial evidence, it was consistently challenged by the defense. As an example, the two airmen who assisted appellant in transporting and disassembling the vehicle both testified that they believed the vehicle belonged to him. At the outset of the government's case, the prosecution witness who found parts of the missing motorcycle in appellant's storage stall testified that appellant explained that he had bought these parts from a man he did not know. Although not a wise thing to do, it is not an uncommon casual business transaction.

Finally, trial counsel concluded his argument on findings by again emphasizing to the triers of fact that ultimately the most important thing that was involved in this case was Captain Gathright's testimony.

Had this vital prosecution evidence been suppressed, the keystone of the government's case would have been removed. I am not convinced beyond a reasonable doubt that the test for legal sufficiency of the evidence set forth in *United States v. Turner*, 25 M.J. 324 (C.M.A.1987) has been satisfied. The Turner test *in toto* provides:

> (T)he Court of Military Review has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt.

I would set aside the finding of guilt and authorize a rehearing.