**UNITED STATES of America**

v.

**Celso VENDRELL–PEÑA, Cecilia Guzmán–Paredes.**

**CR. No. 88–0259 GG.**

United States District Court, D. Puerto Rico.

Oct. 26, 1988.

Antonio R. Bazán, Asst. U.S. Atty., Crim. Div., Hato Rey, P.R., for plaintiff.

Frank Pola, Jr., Ramon Garcia, Santurce, P.R., for defendants.

## OPINION AND ORDER

GIERBOLINI, District Judge.

Defendant Celso Vendrell–Peña (Vendrell), a taxi driver, and defendant Cecilia Guzmán–Paredes (Guzmán), his passenger, are charged with transporting two illegal aliens found hidden in the trunk of a taxi owned by Vendrell. 8 U.S.C. § 1324(a)(1)(B), and 18 U.S.C. 2.

On August 5, 1988 defendant Guzmán filed a motion to suppress certain evidence arising from her arrest. On August 10, 1988, co-defendant Vendrell joined the motion to suppress. Defendants contend that they were detained and questioned by police without probable cause in violation of the fourth and fifth amendments and therefore that testimony from the agents involved, the defendants' sworn statements and all other documents discovered should be suppressed. This matter was referred to the magistrate. After a hearing he issued a report recommending that the motion to suppress evidence be denied. The magistrate was of the opinion that defendant Guzmán, the passenger in the taxi, lacked standing to object to the search of the vehicle. He also found that facts known to the police officers and circumstances surrounding the stop of the vehicle constituted reasonable and articulable grounds for suspicion, justifying a temporary stop and subsequent investigation. Defendants have filed an opposition arguing that the facts found by the magistrate are clearly erroneous, that the detention of defendants and search of the car were done without probable cause and that the questions addressed to defendant Guzmán about her citizenship status violated her constitutional rights.

Since defendants have filed an opposition, a *de novo* determination is required. 28 U.S.C. section 636(b)(1)(C) provides that "[a] judge of the district court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

After a careful examination of the record as a whole, we reach the following independent findings of fact and conclusions of law.

*The Facts*

On June 21, 1988, at approximately 2:45 a.m., William Hernández Cortés and Harold Abreu López, two experienced members of the Puerto Rico Police Department, were on patrol in Aguadilla, Puerto Rico, when they received a radio dispatch informing them that an anonymous phone caller had observed a suspicious vehicle near Montemar Avenue and Las Playuelas. Earlier in the evening, at approximately 9:30, the police had received a report of a landing of illegal Dominicans in the area. Upon receiving the information, officers Abreu and Hernández proceeded to the nearby area and attempted to locate the aforementioned vehicle. They came upon a taxi from Río Piedras, which is in metropolitan San Juan, approximately eighty miles away. The officers suspicions were aroused by the presence of a San Juan taxi in Aguadilla—unusual at any time—at such a remote hour of the morning. The officers signaled the vehicle to stop. The officers observed two people in the taxi, a male driver and a female passenger. While officer Hernández requested the vehicle's registration and identification from the driver, defendant Vendrell, officer Abreu sought identification from the female passenger. Guzmán replied that she was Dominican and cryptically stated that she might have legal documentation with her. However, when asked to produce the documentation she stated that she didn't have any, but that it was in her house in Santurce, in metropolitan San Juan.

The officers were then joined by Lieutenant Medina and officer Carlo. Lieutenant Medina ordered the defendants be taken to the INS Border Patrol Station at Ramey Base. The defendants were driven to the Border Patrol Station in the squad car. The taxi followed, driven by officer Carlo.

Upon arrival at the Border Patrol Office around 3:00 a.m., the security guard telephoned INS officer Alfredo Borrego, informing him of the situation. When he arrived approximately ten minutes later, the defendants and officers Abreu and Hernández were standing outside the office. The taxi had been parked in front and the keys returned to the taxi driver, defendant Vendrell.

INS officer Borrego took charge of the investigation. Both defendants indicated that the taxi driver had been paid $80 to take Guzmán to visit some friends. However, Guzmán could not recall the address or the names of the persons she had visited. Guzmán stated that she was Dominican, and was in Puerto Rico legally, but that her documentation was in Santurce. Neither defendant was handcuffed or searched.

Agent Borrego took Guzmán inside the office while Vendrell waited outside with the two police officers. Vendrell asked the officers if he could leave. They replied that he could not leave without the permission of agent Borrego. Officer Borrego ran a records check through the INS computer to verify the immigration status of defendant Guzmán. While waiting for the results of the records check, agent Borrego questioned the defendants who repeated their explanation about their presence in Aguadilla. After approximately ten minutes, the INS computer check provided an alien number for defendant Guzmán.

Agent Borrego then returned outside and asked Vendrell for the keys to the car in order to check for documents that might pertain to defendant Guzmán. Defendant Vendrell responded affirmatively and handed agent Borrego the keys to the car. Following a brief inspection of the passenger compartment, agent Borrego opened the trunk, and discovered two males, who admitted being illegal aliens. Agent Borrego placed the defendants under arrest. Approximately forty five minutes passed from the initial stop to the discovery of the two illegal aliens.

The defendants were then provided with *Miranda* warnings that were read to them in Spanish. Both defendants signed *Miranda* waivers and confessed that Guzmán had hired Vendrell to transport her brother

and his friend, both Dominicans, from Aguadilla to San Juan.

# I

*The Applicable Law*

We must determine whether the warrantless stop of the vehicle, the subsequent detention, and the search of the trunk violated the fourth amendment and if the subsequent evidence obtained should be suppressed as tainted fruits of those acts.

At the outset, we note that the fourth amendment is not a guarantee against all searches and seizures, but only against unreasonable searches and seizures. *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In *Terry v. Ohio*, 392 U.S. 1, 25–27, 88 S.Ct. 1868, 1882–1883, 20 L.Ed.2d 889 (1968), the Supreme Court recognized that the fourth amendment does not prohibit police-citizen encounters based on less than probable cause for arrest. The Court in *Terry* held that more intrusive encounters, which fall short of full scale arrests, require a reasonable suspicion proportional to the degree of intrusion. *Id.* at 19, 88 S.Ct. at 1878.

The Supreme Court has enunciated a dual inquiry for evaluating the reasonableness of a "Terry stop". A court reviewing police action must inquire:

Whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (*quoting Terry, supra*, 392 U.S. at 23, 88 S.Ct. at 1881.) *See also United States v. Streifel*, 781 F.2d 953 (1st Cir.1986) (applying *Sharpe* standard); *United States v. Trullo*, 809 F.2d 108 (1st Cir.1987) (same).

A determination of whether the stop was justified at its outset depends on the totality of the circumstances confronting the officer. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). ("[T]he assessment must be based upon all of the circumstances"). Weight is given "to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry, supra*, 392 U.S. at 27, 88 S.Ct. at 1883.

Clearly, police officers possessing a reasonable and articulable suspicion that a person is engaged in criminal activity may conduct a brief stop of an automobile to investigate. *Cortez, supra*, 449 U.S. at 421–22, 101 S.Ct. at 696–97; *United States v. McHugh*, 769 F.2d 860 (1st Cir.1985). Among the articulable factors which the officers considered was the nature of the area, Aguadilla, where countless illegal aliens seek entry into Puerto Rico from the Dominican Republic. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) ("officers may consider the characteristics of the area in which they encounter a vehicle"); *Cortez, supra*, 449 U.S. at 419, 101 S.Ct. at 696 ("of critical importance, the officers knew that the area was crossing point for illegal aliens"). Location alone, however, is insufficient to justify a *Terry* stop. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979); *Trullo, supra*, 809 F.2d at 111.

A second articulable factor was the presence of a San Juan taxi in a remote part of the island. *See* La Fave, *Search and Seizure* § 9.3(c) at p. 451–52 (2d ed. 1987) and cases cited therein ("Yet another [Terry] factor which is commonly taken into account by the police is whether the individual 'fits' the area in which he is found"). Moreover, the Aguadilla police received reports earlier in the evening of a landing of illegal Dominicans in the area, and of a "suspicious" vehicle in the area just minutes before the stop. Finally, the officers were entitled to take into account the time of night. La Fave, *supra*, at 454 and cases cited therein (time of day one of several factors properly considered in determining whether grounds for *Terry* stop). We find that the presence of a San Juan taxi at 2:45 a.m., a late and unusual hour, in conjunction with the other enumerated factors gave rise to an articulable, reasonable suspicion of criminal activity, justifying the initial stop of the taxi.

■ That the investigative stop of defendants was justified at its inception does not end the inquiry. The search or seizure actually conducted must be reasonably related in scope to the circumstances justifying the search or seizure in the first instance. *United States v. Ogden*, 703 F.2d 629, 634 (1st Cir.1983); *Terry, supra*, 392 U.S. at 20, 88 S.Ct. at 1879; *Sharpe, supra*, 470 U.S. at 682, 105 S.Ct. at 1573. After the taxi was stopped by the officers, they questioned the defendants briefly as to their identities, but no frisk or search was conducted. Clearly, the limited scope of the stop was reasonably related to the investigation and did not create an excessive intrusion into the defendants' privacy interest.

## II

We turn next to the lawfulness of the officers' action in taking defendants to Ramey Base and detaining them during the investigation. In such circumstances of detention for custodial interrogation it is now clear that regardless of whether there was a technical arrest, probable cause, the same as for an arrest, had to exist. *Dunaway v. New York*, 442 U.S. 200, 215, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979); *United States v. Matthews*, 615 F.2d 1279, 1284 (10th Cir.1980).

Probable cause exists when the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that the suspect had committed or was committing an offense. *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *United States v. Figueroa*, 818 F.2d 1020, 1023–24 (1st Cir.1987). The probable cause issue must be analyzed under the "totality of the circumstances" as to whether there is a "fair probability" that the crime is occurring. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *United States v. Baldacchino*, 762 F.2d 170 (1st Cir.1985).

If, therefore, there was probable cause to justify the arrest, it had to have existed at the moment the defendants were told to get into the police car for further station house inquiries. *See United States v. Tarango–Hinojos*, 791 F.2d 1174, 1176 (5th Cir.1986); *see also United States v. Marin*, 669 F.2d 73, 81 (2d Cir.1982). It is clear that well-founded suspicion to stop for interrogatory detention may ripen into probable cause for arrest through the occurrence of facts or incidents after the stop. *United States v. Medina–Gasca*, 739 F.2d 1451, 1453 (9th Cir.1984).

■ The facts of this case indicate that well-founded suspicion ripened into probable cause to arrest during the course of the investigative stop. Defendant Guzmán's admission that she was Dominican, her evasive answers about her legal status, and her inability to provide any documentation, combined with the officers' pre-existing suspicions and information were sufficient to give rise to probable cause that she had violated United States immigration laws. As to defendant Vendrell, the presence of a suspected illegal alien in his taxi at a late and unusual hour provided probable cause that he too was violating United States immigration laws. *See* 8 U.S.C. § 1324(a)(1)(B).

## III

■ Under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed. 2d 694 (1966), a suspect is entitled to be informed of his privilege against compelled self-incrimination guaranteed by the fifth amendment whenever he is subject to custodial interrogation. A custodial situation necessitating *Miranda* warnings arises only where "there is 'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). Thus, a person who has been *Terry* stopped must be advised of his *Miranda* rights if and when he is "subjected to restraints comparable to those of a formal

arrest." *Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

To determine whether a suspect is "in custody" at a particular time a policeman's unarticulated plan has no bearing; "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3151. Among the factors a court should consider in applying this objective test was whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers at the scene, the degree of physical restraint placed upon the suspect and the duration and character of the interrogation. *United States v. Streifel,* 781 F.2d 953, 961, n. 13 (1st Cir.1986). *See also* 1 W. La Fave & J. Isreal, *Criminal Procedure* § 6.6, at 494–99 (1984).

After a close examination of the facts of this case, we find that the defendants were indeed in custody once they were placed in the squad car and remained in custody while they were being interrogated at Ramey Base. We note that station house interrogation does not always require that *Miranda* rights be given. *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*Miranda* rights not necessary since suspect went to station voluntarily and no restriction placed on his freedom). Here, however, the defendants were taken involuntarily to a Border Patrol Station, a location fraught with coercive connotations. The defendants were held there, questioned, and expressly told that they were not free to leave. Under these circumstances of station house detention in the early hours of the morning, reasonable persons in defendants' positions would have believed that they were facing arrest and felt pressures that sufficiently impaired the free exercise of their fifth amendment privileges. Thus, we find that all statements made by defendants after they were placed in the patrol car and prior to their receipt of *Miranda* warnings must be suppressed.

## IV

■ Next, defendants maintain that the search of the taxi was done without the voluntary consent of defendant Vendrell. The question of whether a consent to search was voluntary or was instead the product of duress or hearsay, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Moreover, a prosecutor who seeks to rely upon consent to justify the lawfulness of a search shoulders the burden of proving that the consent was, in fact, freely and voluntarily given. *Id.* at 222, 93 S.Ct. at 2045. Among the factors to be considered in determining the voluntariness of the consent are the defendant's age, education, level of intelligence, emotional state, prior contact with the criminal justice system, the length of detention prior to consent, whether defendant was in custody or under arrest, whether defendant was in familiar surroundings, whether defendant was in handcuffs, the use of physical punishment or implied or express threats, or police deception or misconduct. *United States v. Puglisi,* 790 F.2d 240, 243–44 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986).

As the Supreme Court stated in *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *See also United States v. Cepulonis,* 530 F.2d 238, 243–44 (1st Cir.) (consent voluntary despite arrest), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976); *United States v. Rodríguez Pérez,* 625 F.2d 1021, 1024 (1st Cir.1980). In any custody situation there exists a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the custody situation to obtain the consent. *United States v. Jones,* 475 F.2d 723, 728 (5th Cir.), *cert. denied,* 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973).

Agent Borrego testified that he asked defendant Vendrell if he would allow him

to look in his car for documents pertaining to defendant Guzmán and if so, for the keys. Suppression Hearing Transcript, Vol. II, p. 133. Vendrell complied by handing him the keys. *Id.* There is no evidence of use or threat of force, nor promises or coercion. Vendrell had been detained for only a brief period, was outside, and not confined in a cell or limited space, and was under no physical restraint or handcuffs. Under these circumstances, we find that the government met its burden of showing the voluntariness of defendant Vendrell's consent to search his taxi. To hold that illegal coercion arises out of custody alone would clearly run afoul of the voluntariness standard espoused by the Supreme Court in *Schneckloth* and reaffirmed in *Watson.*[1]

## V

■ Finally, defendant Guzmán argues that questions directed at her regarding her citizenship in a setting equal to a secondary border violated her constitutional rights, citing the case of *Celso López v. Aran,* 844 F.2d 898 (1st Cir.1988). In *Celso López,* the First Circuit held that checkpoints at a Puerto Rican airport to question passengers destined for the mainland United States did not violate the fourth amendment. The court also found that the Immigration Service's policy of seizing passengers' tickets prior to questioning without any articulable suspicion violated the fourth amendment. *Id.* at 907–908. *Celso López* is inapposite here. Unlike the illegal seizure of passengers' tickets in *Celso López,* defendant Guzmán was stopped and questioned based on a reasonable and articulable suspicion that a crime had taken place or was about to occur. Clearly, reasonable stops aimed at checking the flow of illegal aliens into this country are both necessary and legal. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Accordingly, we find that statements made by defendants after being taken into

police custody and prior to receiving their *Miranda* warnings were obtained in violation of defendants' fifth amendment privilege against self-incrimination, and, consequently, the suppression of the post-custody but pre-arrest statements is GRANTED. We also find the investigatory stop to be supported by reasonable suspicion, the custodial arrest to be supported by probable cause, and defendant Vendrell's consent to search the taxi to be freely and voluntarily given. Consequently, the suppression of a) evidence obtained as a result of the search, and b) statements made by defendants prior or to their entry into the police car and after receipt of *Miranda* warnings is hereby DENIED.

Wherefore, in view of the foregoing, the Magistrate's Report and Recommendation of September 13, 1988 is hereby affirmed as modified by this opinion.

SO ORDERED.

---

1. Since we find that defendant Vendrell voluntarily consented to the search of the taxi, we need not reach the issue of defendant Guzmán's standing to object to the search. We do, however, question whether Guzmán had a reasonable expectation of privacy in the trunk of a hired taxi. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).