**UNITED STATES, Appellant and Cross–Appellee,**

v.

**Craig J. BRABANT, Sergeant, U.S. Air Force, Appellee and Cross–Appellant.**

No. 60,838.
ACM 26547.

U.S. Court of Military Appeals.

Sept. 29, 1989.

For Appellee: *Captain William E. Boyle* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellant: *Major Carole W. Hanson* (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

In October 1987, appellee was tried by a general court-martial composed of officer members at Norton Air Force Base, California. Contrary to his pleas, he was found guilty of larceny of a motorcycle with a value of more than $100.00, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to a bad-conduct discharge, confinement for 2 years, forfeiture of $100.00 pay per month for 10 months, and reduction to the lowest enlisted grade. The convening

authority approved the sentence as adjudged. The Court of Military Review affirmed the findings of guilty and the sentence. 26 MJ 899 (1988).

Pursuant to Article 67(b)(2), UCMJ, 10 USC § 867(b)(2), the Acting Judge Advocate General of the Air Force requested review of two certified issues. This Court also granted review of an issue assigned by appellee and modified by this Court. These issues are:

## CERTIFIED ISSUE I

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW BY HOLDING THAT A SECURITY POLICE COMMANDER'S MEETING WITH A SUBORDINATE ACCOMPANIED BY AN ADMONITION TO SAY NOTHING WAS A REINITIATION OF INTERROGATION UNDER *EDWARDS V. ARIZONA*, 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (1981).

## CERTIFIED ISSUE II

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED BY EXPANDING *EDWARDS V. ARIZONA, SUPRA*, TO PROHIBIT ALL CONTACT BETWEEN SECURITY POLICE SUPERVISORY PERSONNEL AND SUBORDINATES WHO HAVE REQUESTED COUNSEL UNDER *EDWARDS* UNTIL COUNSEL IS MADE AVAILABLE.

## GRANTED ISSUE

WHETHER THE COURT OF MILITARY REVIEW ERRED AS A MATTER OF LAW IN CONCLUDING THAT ALTHOUGH [THE ACCUSED'S] INCRIMINATING PRETRIAL STATEMENT TO CAPTAIN GATHRIGHT SHOULD HAVE BEEN SUPPRESSED, THE RECORD WAS STILL SUFFICIENT TO PROVE [THE ACCUSED'S] GUILT BEYOND A REASONABLE DOUBT.

We hold that the acting commander of appellee's security police squadron reinitiated interrogation when he directed appellee, his subordinate who had previously requested counsel during a criminal interrogation, to meet with him concerning the charged offenses. *See Edwards v. Arizona, supra; United States v. Dowell*, 10 MJ 36 (CMA 1980); *cf. Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed. 2d 297 (1980). We also conclude that admission of appellee's statements induced by that order was prejudicial error requiring a rehearing.

The facts of this case have been amply set forth in the opinion below and need not be fully repeated here. Appellee observed another servicemember's motorcycle that he decided to strip for parts. When the opportunity arose, he took the motorcycle, stripped it of the desired parts, and abandoned the remainder. Later, appellee consented to a search of his off-post quarters, and the stolen parts were recovered.

Moreover, the court below stated in its opinion:

The appell[ee] was a security policeman who normally worked the "midnight" shift. He was relieved of police duties as soon as he became a suspect in this case, but he was still required to report to security police headquarters and spend his normal shift. Sometime after he had been relieved, the appell[ee] was questioned by the security police investigator. After the investigator read him his rights, the appell[ee] exercised his right to remain silent and requested a lawyer. This occurred around 0200 during a normal duty period for the appell[ee].

The assertion of error concerns what happened next. The investigator ended the session as soon as the appell[ee] requested a lawyer. Shortly after the session ended one of the security policemen who had helped the appell[ee] take and strip the motorcycle submitted a sworn statement to the investigator explaining how he and another security policeman had helped the appell[ee]. The investigator contacted Captain Michael Gathright, who was the squadron operations officer,

acting commander, and appell[ee]'s second level supervisor. Captain Gathright asked the investigator to have the appell[ee] stand by in the police station and report to him at 0730.

26 MJ at 900.

At no time before reporting to Captain Gathright did appellee see requested counsel, and such action was not reasonably practicable at this early hour. Regarding this meeting, Captain Gathright testified that the following occurred:

Q: What were your purposes in calling Sergeant Brabant in to speak with you?

A: *My sole purpose was to inform him that he needed to talk to a lawyer.*

Q: When you told him that he needed to talk to a lawyer, did he say anything or attempt to say anything?

A: Yes, he did.

Q: And can you tell us what happened?

A: When I first asked him to report in or have him report in, immediately after his salute, *he tried to make a spontaneous comment. I tried to stop him, told him, "Don't say anything; you need to see a lawyer" and ended up saying that twice and he did, in fact, make a spontaneous comment after the third time.*

Q: It's important for you to try to recall that as close as you can. What was that comment or the comments that he made to you?

A: It was basically *"What can I do to make this right; I will give the victim my motorcycle, sign over the pink slip; take an Article 15, [UCMJ, 10 USC § 815,] lose a stripe, whatever it takes."*

(Emphasis added.)

At trial, appellee moved to suppress his statements to Captain Gathright. The military judge denied the motion on the basis that Captain Gathright had not intended to conduct an interrogation when appellee made his voluntary statements. On appeal, the Court of Military Review held that the morning interview violated the mandate in *Edwards v. Arizona,* supra, for the "police to 'go away' for a reasonable time once an accused has requested a lawyer." Insofar as this was not done, the court below concluded that the evidence should have been suppressed. Nonetheless, it held that there was overwhelming admissible evidence to support the conviction and concluded that the error "most likely had only a minor effect on the ultimate outcome of the case." 26 MJ at 902.

-----

I

The decision of this Court in *United States v. Goodson,* 22 MJ 22 (CMA 1986), recognized applicability of *Edwards v. Arizona, supra,* and its progeny, to the military justice system. In this light, the first question we will address is whether the court below properly construed these decisions in this case. It held that they prohibit a police commander from subjecting his subordinate, who has previously exercised his right to counsel, to a subsequent meeting at the same police station to give him further advice to contact counsel concerning the same offense. We agree with the Court of Military Review.

In *Edwards v. Arizona, supra,* the Supreme Court stated

> [t]hat when the accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted). In *Arizona v. Roberson,* 486 U.S. 675, 681–82, 108 S.Ct. 2093, 2097–98, 100 L.Ed.2d 704 (1988), the Su-

preme Court further explained what evil this "bright line" test was designed to combat:

Thus, the prophylactic protections that the *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] warnings provide to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self-incrimination," 384 U.S., at 467, 86 S.Ct., at 1624, are implemented by the application of the *Edwards* corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect. As Justice WHITE has explained, "the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." *Michigan v. Mosley*, 423 U.S. 96, 110, n. 2, 96 S.Ct. 321, 329, n. 2, 46 L.Ed.2d 313 (1975) (concurring in result).

The pivotal question in the case before us is whether Captain Gathright's order to appellee to attend this meeting constituted a "reinitiation of interrogation," so as to trigger application of the "bright line" test enunciated above. *See Rhode Island v. Innis, supra; Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). On this point we note that in *United States v. Dowell*, 10 MJ at 40, this Court stated, concerning the requirement to give warnings under Article 31, UCMJ, 10 USC § 831:

*When one takes action which foreseeably will induce the making of a statement* and a statement does result, we conclude that the statement has been "obtained" for the purposes of Article 31, 10 USC § 831. We need not question the good faith of Captain Black, who had

a specific duty to inform the accused of the charges against him. *See* para. 32*f* (1), Manual [for Courts–Martial, United States, 1969 (Revised edition)]. However, *since the acts involved in performing that duty had the natural tendency to induce the making of a statement by appellant,* the warning requirement of Article 31(b), 10 USC § 831(b) was applicable.[10] Thus, the absence of any warning to Dowell precluded receipt of his statements in evidence.

---

[10] On the same reasoning, these actions by Captain Black were the "functional equivalent" of "custodial interrogation."

(Emphasis added.) This reasoning is virtually identical to that expressed in *Rhode Island v. Innis, supra* at 301, 100 S.Ct. at 1689–90. There, the Supreme Court stated:

[T]he term "interrogation" under *Miranda* refers not only to express questioning, *but also to any words or actions on the part of the police* (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response from the suspect.* The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

446 U.S. at 301, 100 S.Ct. at 1689–90 (emphasis added; footnotes omitted). In *United States v. Byers*, 26 MJ 132, 134 (CMA 1988), this Court also noted the broad definition of "interrogation." We said there:

If we were not equally realistic in our treatment of investigative tactics which are "the 'functional equivalent' of interrogation," we would be providing investigators a ready means for circumventing Article 31(b) and thwarting congressional intent.

In the instant case, the evidence of record discloses that appellee was required to stand by for 5 hours at the police station, the situs of his initial interrogation, before meeting with his squadron commander. *Cf. United States v. Long*, 866 F.2d 402, 405 (11th Cir.1989). He was not

provided a break in this custody or, in light of the early hour, a reasonable opportunity to consult with counsel. *See Davis v. Puckett,* 857 F.2d 1035, 1037 (5th Cir.1988); *cf. Dunkins v. Thigpen,* 854 F.2d 394, 397 (11th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *United States v. Vendrell–Pena,* 700 F.Supp. 1174 (D.P.R.1988). Moreover, the purpose of the meeting was not explained to him, and Captain Gathright maintained both a military and police investigatory relationship with appellee at this time. *Cf. United States v. Eide,* 875 F.2d 1429, 1433–34 (9th Cir.1989). Strict military formality was maintained at the meeting; and Sergeant Marchbanks, appellee's previous police interrogator, was present for the meeting between Captain Gathright and appellee, who was then visibly shaken.

Under these circumstances, we conclude that "inherently compelling pressures" of the initial interrogation continued to exist for this command meeting. Unlike *Rhode Island v. Innis, supra,* where that accused simply overheard remarks between police officers which led to a volunteered admission, this case involved a direct and deliberate confrontation between the appellee and an officer of the military police. Indeed, it is the directness of this confrontation which renders *Arizona v. Mauro, supra,* inapplicable as well. Moreover, in light of Captain Gathright's ambiguous position and the obvious redundance and superfluity of his purpose, we do not consider this meeting to be merely informational in the sense permitted by *Arizona v. Roberson,* 486 U.S. at 687, 108 S.Ct. at 2101. *Cf. Shedelbower v. Estelle,* 859 F.2d 727 (9th Cir.1988). *See generally* Berger, *Compromise and Continuity: Miranda Waivers, Confession Admissibility, and the Retention of Interrogation Protections,* 49 U.Pitt.L.Rev. 1007, 1036–42 (1988).

As was the case in *Dowell,* we need not question the motives of Captain Gathright since this confrontation "had the natural tendency to induce the making of a statement by" an accused. 10 MJ at 40. Instead, we need only note that a good commander is a leader who inspires trust and loyalty in his subordinates. *See United States v. Austin,* 27 MJ 227, 232 n. 7 (CMA 1988). In some instances, however, the commander's efforts to maintain trust and loyalty in the subordinate might conflict with his responsibility to maintain law and order in the command. Accordingly, care must be exercised to prevent the creation of situations where the subordinate's sense of loyalty, trust, and confidence in his leader obscures his legal rights under the Constitution and the Uniform Code of Military Justice. Accordingly, we conclude that ordering appellee to attend this morning meeting was, under the circumstances of this case, the functional equivalent of a "reinitiation of interrogation" prohibited by *Arizona v. Roberson, Edwards v. Arizona,* and *United States v. Byers,* all *supra. See United States v. Reeves,* 20 MJ 234, 236 (CMA 1985); *cf. United States v. Jackson,* 863 F.2d 1168, 1172 (4th Cir.1989).

■ The final issue in this case is whether the court below erred in concluding that it could nonetheless uphold appellee's conviction. Although we agree with that court that substantial evidence of his guilt existed in this record of trial, we nevertheless conclude that the error in admission of his inculpatory statements prejudiced him. *See generally United States v. Remai,* 19 MJ 229 (CMA 1985).

In the Government's opening argument, initial closing argument, and closing argument in rebuttal, counsel substantially rested the prosecution case upon appellee's admissions. In opening argument, government counsel informed the members that they would hear "the statements of a guilty man." In closing argument, government counsel stated:

> And, ultimately, *the most important thing involved perhaps is that when he was confronted by Captain Gathright— or at least talked with Captain Gathright at some later time—he didn't make the statements of an innocent man.* The statements he made were "I'll do anything; I'll sign over my mo-

torcycle to him; he can have my pink slip; give me an Article 15, take a stripe, anything."

Gentlemen of the jury, madam, those are the words of a man who knows he's been caught; a man who knew that the jig was up; a man who was certain that the evidence had been formulated and had come together against him.

That is the culmination of the case which proves inescapably, without any doubt whatsoever, that the accused stole the motorcycle on that night in question. Thank you.

(Emphasis added.) Finally, in the closing argument in rebuttal, trial counsel once more brought appellee's admissions to the forefront of the members' consideration:

And if there isn't a motorcycle fairing [*see* 26 MJ at 900], why did the accused make inculpatory statements acknowledging that he'd do anything to get out of trouble? He'd sign over his motorcycle; he'd give the victim his pink slip. Did the motorcycle fairing cause him to lose sight of the fact that an innocent person has the right to proclaim, "I didn't do it. I'll do anything to prove I didn't do it." Did the motorcycle fairing make him decide that he had to sign over his own bike?

\* \* \* \* \* \*

But if you believe in common sense, if you believe that people make dumb mistakes, if you believe that greed sometimes impels what may be, in other ways, a good cop to do things that are stupid, and if you agree with the fact, as presented here, that all of the evidence points in the direction of the accused, then the very fact that he did all these acts in preparation up to the point that he ultimately ended up with the stolen parts in his possession *and made statements indicating nothing other than guilt*, then you must believe that the Government has proven its case beyond a reasonable doubt, and that the accused

is, in fact, guilty of the offense. Thank you.

(Emphasis added.)

As Judge Michalski noted below in his dissent, "Had this vital prosecution evidence been suppressed, the keystone of the government's case would have been removed." 26 MJ at 903. He further noted that appellee challenged the entire government case with an innocent explanation. *Id.* In this context we cannot say that the improper admission of these statements had no effect on the members in reaching their findings. *See generally Chapman v. California*, 386 U.S. 18, 24–25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See United States v. Davis*, 26 MJ 445, 449–50 n. 4 (CMA 1988). Accordingly, the error here is not harmless beyond a reasonable doubt.

## II

This case might also be decided on evidentiary grounds alone. Brabant's statements to his commanding officer should have been excluded under Mil.R. Evid. 410, Manual for Courts–Martial, United States, 1984. *See United States v. Barunas*, 23 MJ 71 (CMA 1986).

As noted earlier, in the military there exists a special relationship between a commander and one of the servicemembers in his command. That relationship is unique in our American society. A good commander not only leads and disciplines his troops but also has a paramount responsibility to take care of them. A good commander inspires trust in his subordinates. *See United States v. Austin, supra* at 232 n. 7. The challenged statements that morning, in reality, constituted a request to the commander that he resolve Brabant's troubles in an administrative fashion. These statements were based upon that special subordinate/commander relationship and as such we find them to be part of a plea bargain negotiation under the rationale of *Barunas*. *See* Mil.R.Evid. 410. Accordingly, they never should have been introduced in this case.

The decision of the United States Air Force Court of Military Review is re-

versed.* The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge EVERETT concurs.

COX, Judge (concurring in part and dissenting in part):

I agree that the conversation between appellee and his commanding officer which occurred shortly after appellee's exercise of his right to consult with counsel was not admissible as evidence against him. I agree that Mil.R.Evid. 410, Manual for Courts–Martial, United States, 1984, would bar admissibility of the evidence. *United States v. Barunas*, 23 MJ 71 (CMA 1986). I respectfully dissent from the majority's characterization of this conversation as an interrogation.

I have elsewhere stated my grave reservations about applying civilian constitutional doctrines to military jurisprudence without thoughtful consideration of all aspects of military life. As I indicated in *United States v. Reeves*, 20 MJ 234, 237 (CMA 1985) (Cox, J., concurring in the result): Quite simply, we are not dealing with the *police practices* condemned in ... [*Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ] and its progeny. Moreover, the inflexible application of this rule in the above-context might seriously undermine the important, if not vital, relationship between a company commander and a member of his unit.

I am especially concerned about applying the exclusionary rule to evidence "obtained by responsible command action." *United States v. Morris*, 28 MJ 8, 14, 18 (CMA 1989) (Cox, J., concurring in part and dissenting in part). This case illustrates once again the traps, pitfalls, and obstacles placed in front of military officials trying— in good faith—to carry out the responsibilities incumbent upon them. Ironically, it is *uncontradicted by appellee or any evidence in the record* that the officer here— who happened at the time to be the acting commander of the unit—was trying to ensure that appellee understood the seriousness of the allegations and that he obtained counsel. It is one thing to decline a police interrogation at 2:00 a.m. and quite another to actually get over to the area defense counsel's office and initiate an attorney-client relationship. Contrary to the majority's view, the acting commander's actions and purposes were anything but an "obvious redundancy." 29 MJ at 263.[1]

The majority opinion does an excellent job of building a syllogism to apply the rule enunciated in *Edwards v. Arizona, supra,* to the situation here. If one accepts the conclusion that the conversation between appellee and his superior was the "functional equivalent" of an interrogation, then of course the exclusionary rule applies to the fruits of the unlawful interrogation. *United States v. Harris*, 19 MJ 331 (CMA 1985). I, however, do not accept that conclusion.

If this was an interrogation, it is the strangest one I have seen in over 22 years at the bar and bench:[2]

* The second certified question is overly broad, and we decline to answer it to the extent it goes beyond the facts and circumstances in this case.

1. Regarding the right to counsel, *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966), states:
   Once warnings have been given, the subsequent procedure is clear.... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an

attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

2. It is interesting to note that appellee has never testified that he felt "compelled" to incriminate himself. U.S. Const. amend. V. The "interrogator" also did not testify that circumstances surrounding the conversation would lead a reasonably prudent sergeant in the United States Air Force to confess. It is interesting for me to note facts in evidence:
   1. Appellee was on duty from 2300 hours until 0700 hours. Thus, the investigation and

Q. What, if anything, did you say to him after he reported to you?

A. As soon as he reported, I got the feeling that he wanted to make a comment and I understood from the investigator that he did want a lawyer and I says, *"Say nothing."* And he says, "Yeah, but—" I said *"Don't say anything.* You need to go see a lawyer." And at that time he made a spontaneous comment.

Q. And what was the content of the comment that he made spontaneously?

A. To the best of my memory, his comment was "What can I do to make this right? I'll sign over my motorcycle; I'll give him my pink slip, Article 15, lose a stripe, whatever."

(Emphasis added.) I characterize this conversation as a spontaneous negotiation attempt by appellee: a plea not to be prosecuted.[3]

The facts presented here are closely akin to those in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), where Bradshaw "reinitiated" interrogation by asking, "What is going to happen to me now?" Critical to the decision in *Bradshaw* was the fact that the policeman reminded Bradshaw that "you do not have to talk to me." "Say nothing" is much stronger language than "You do not have to talk."

> [N]ot ... all statements ... are ... the product of interrogation. As the Court in *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] noted:
>
> > "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is*

*not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated....* Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." ... (emphasis added).

It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogations," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. *Rhode Island v. Innis,* 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1688–89, 64 L.Ed.2d 297 (1980) (footnote omitted), quoting *Miranda v. Arizona, supra* at 478, 86 S.Ct. at 1630.

It is obvious that this exchange between appellee and his superior officer was not "the act of ... questioning," which, according to *The Random House Dictionary of the English Language* 698 (College rev.ed. 1980), is "interrogation." It also was not the "functional equivalent" of "interrogation," since "equivalent" means "equal in value, ... force [or] significance." *Id.* at 447, 86 S.Ct. at 1613.

The "functional-equivalent" doctrine is invoked "[w]hen conversation *is designed* to elicit a response from a suspect," at which time "it ... [becomes] interrogation, regardless of the subtlety of the approach." *United States v. Borodzik,* 21 USCMA 95, 97, 44 CMR 149, 151 (1971) (emphasis added). It has a component of intentional action by the interrogator "designed to elicit a" confession.

---

questioning took place during his normal duty day or some 30 minutes thereafter.

2. Appellee was never confined in a jail cell as are most civilians who are apprehended in the middle of the night for larceny of a motor vehicle.

3. The "interrogator" who was called as a witness to the conversation was a long-time acquaintance of appellee and a fellow air police-

man; hardly the "heavy" that he is depicted to be.

**3.** This is the reason that I concur in Part II of the majority opinion. If appellee had obtained counsel and if counsel had approached the commander with this same suggestion, no one would have considered it to be of evidentiary value.

Nothing in this record suggests that the officer intentionally and designedly set out to obtain a confession during this one-and-one-half to two-minute conversation wherein appellee was twice admonished not to say anything and was also advised to get a lawyer. Further, there is nothing to indicate that this was an orchestrated event, one "reasonably likely" to induce appellee to give an incriminating response.[4] If there were such a suggestion—a pregnant pause, a raised eyebrow, anything—I would be the first to champion exclusion. The fact is, there can be no interrogation or the functional equivalent thereof when the would-be interrogator is doing everything possible to prevent the communication.

Interestingly enough, the Court of Military Review did not ground its opinion on the conclusion that the conversation was the "functional equivalent" of interrogation or involved a "reinitiation of interrogation." Rather, the gravamen of that court's ruling sprang from the serendipitous circumstance that both the accused and the officer were police officials. In the court's judgment, "Edwards [v. Arizona, supra,] requires the police to 'go away' for a reasonable time once an accused has requested a lawyer"; therefore, because appellee was taken to meet with his superior officer, who also happened to be a military policeman, the requirements of Edwards were not met. United States v. Brabant, 26 MJ 899, 902 (AFCMR 1988), citing Ari-zona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).[5]

The Court of Military Review created a bright-line rule which prohibits a police superior from talking to a subordinate who has invoked the right to counsel until counsel has been meaningfully provided. This might be termed the "glass bubble" rule.

In my judgment, the Court of Military Review was on the right track, although I emphasize that this case need not be resolved by applying civilian constitutional doctrine. As I view it, the jurisprudential value of this case does not lie in its unique facts. Instead, we should be addressing the tension between Edwards v. Arizona, supra, a rule designed to apply to police interrogations, and Article 31, Uniform Code of Military Justice, 10 USC § 831, a rule designed to protect servicemembers from inherently unequal superior-subordinate relationships.

I have no doubt that the concerns expressed by the Supreme Court in Miranda and Edwards can be accommodated in military jurisprudence. See United States v. Lewis, 12 MJ 205 (CMA 1982), wherein Judge Cook, speaking for the Court, gave an excellent treatment of the subordinate-superior relationship and the reasons for the enactment of Article 31. Wherever the balance be struck, however, the rules must be simple and straightforward; easy to teach and apply at the lowest levels of leadership. If the only way to ensure these constitutional values is to propound a

---

4. Compare Rhode Island v. Innis, 446 U.S. 291, 302–03, 100 S.Ct. 1682, 1690–91, 64 L.Ed.2d 297 (1980) (where the Supreme Court held Innis "was not subjected by the police to words or actions that ... [they] should have known were reasonably likely to elicit an incriminating response from him" and, thus, he "was not 'interrogated' within the meaning of Miranda") with Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (where the Court held there was "no reasonable basis for finding that Williams waived his right to the assistance of counsel" where "[d]espite ... [his] express and implicit assertions of his right to counsel, [the] Detective ... proceeded to elicit incriminating statements from" (id. at 405, 97 S.Ct. at 1243) him by "deliver[ing] what has been referred to ... as the 'Christian burial speech,'" (id. at 392, 97 S.Ct. at 1236) without "prefac[ing] this effort

by telling Williams that he had a right to the presence of a lawyer" or attempting "to ascertain whether Williams wished to relinquish that right," id. at 405, 97 S.Ct. at 1243).

5. The problem is not new to the military. Although decided before Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), United States v. Duga, 10 MJ 206 (CMA 1981), foretold the problems concerning informal pretrial admissions between service policemen. The lessons of Duga seem applicable here. This conversation was not an "official interrogation" and appellee could not have reasonably conceived it as such. Thus, neither Article 31, Uniform Code of Military Justice, 10 USC § 831, nor Edwards v. Arizona, supra, has been violated.

rule prohibiting anyone from talking to anybody who has invoked the right to counsel, then so be it. But, if such a prophylactic rule is needed in the military society, we should say so and not create fictions such as the one perpetrated here.

A straight-forward rule would require the military community to isolate individuals who have invoked counsel rights and to adopt methods for identifying unapproachable persons to prevent inadvertent contamination (even that re-initiated by the suspect) such as here.[6] The other extreme is to reject *Oregon v. Bradshaw, supra,* and hold that all statements made by a member after counsel has been requested are excluded.

I do not subscribe to the view that such prophylactic rules are necessary or appropriate, and I do not believe that such rules are required by the Constitution or by military due process. In any event, the rules

heretofore announced by the Supreme Court have consistently dealt with the confrontation between police and citizens, and not with the working relationships developed over a period of time in a military command. I believe courts can examine the conduct of officials involved and rationally determine whether it constitutes *interrogation* or the "functional equivalent" thereof. There is a difference between contact for some legitimate purpose and interrogation.

Here there was no interrogation or anything remotely similar thereto. I would hold the conversation inadmissible because of *what was said* and not because of the circumstances wherein it took place. Indeed, if appellee himself had requested permission to speak to the commander and had "reinitiated" their conversation, it would still be inadmissible, in my view, as a pretrial negotiation.

---

**6.** Obviously such a rule would be unworkable. A commander has many other responsibilities which require his communication with an accused. For example, he must decide whether to confine him pretrial; he must deal with his dependants, his personal belongings, and his vehicle. If there is a decision not to confine the accused pretrial, the commander must then decide what duties he shall perform and what restrictions shall be imposed. In other words, a commander is confronted with a number of decisions regarding his unit and the accused which require communications. A "good commander," as pointed out by the majority, will counsel and guide his subordinates, inspiring loyalty, trust, and confidence and insure that they understand their legal rights. I would suggest this is exactly what happened here. If not, appellee would most certainly have said so.